## 35275. CLOUGH *v.* GREYHOUND CORPORATION.

DECIDED DECEMBER 3, 1954—REHEARING DENIED DECEMBER 16, 1954.

*Nall, Sterne & Miller,* for plaintiff in error.

*Gambrell, Harlan, Barwick, Russell & Smith, James C. Hill,* contra.

QUILLIAN, J. ■ In special ground 6 of the amended motion for new trial, error is assigned on the overruling of an objection to the admission of evidence that no charge was made at the police station against the driver of the bus in which the plaintiff was a passenger. An acquittal in a criminal proceeding dealing

with the same subject matter is not evidence for the defendant in a civil action. *Cottingham* v. *Weeks*, 54 *Ga.* 275. A plaintiff may not show, in a civil action for damages resulting from an automobile collision, that the defendant was adjudged guilty in traffic court for an offense in connection with the same transaction. *Padgett* v. *Williams*, 82 *Ga. App.* 509 (3) (61 S. E. 2d 676). Accordingly, it would be improper to allow a defendant in like circumstances to show that no traffic case had been made against him or that, if made, he had been adjudged not guilty. While this error might not be sufficient to reverse some cases, it is nevertheless error in any case because, if a plaintiff cannot introduce evidence to show that a case was made, then by the same process of reasoning the defendant cannot show that such a case was not made. The rule that error, in order to be reversible, must be harmful is recognized; but in this case the evidence was certainly in a close and doubtful case. In close and doubtful cases error is reversible which otherwise would not warrant the setting aside of a verdict. *Savannah, Fla. & Western Ry. Co.* v. *Harrigan*, 80 *Ga.* 602 (2) (7 S. E. 280).

■ Special ground 5 of the amended motion for new trial contends that the court erred in charging the jury as follows: "In connection with the matter of damages, if you come to consider the question of damages in the case, the court charges you that where by negligence one is injured, he is bound to lessen the damages so far as is practicable by the use of ordinary care and diligence. The court further charges you that if a passenger is injured by the negligence of a carrier, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence, and ordinary care or diligence is that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances." It is contended that the rule referred to by the court is in regard to contracts and has no application to a tort action. Code § 105-2014 provides as follows: "Where by negligence one is injured, he is bound to lessen the damages· as far as is practicable by the use of ordinary care and diligence; but this does not apply in cases of positive and continuous torts." This Code section was taken from four Supreme Court decisions, one of which is *Georgia R. & Bkg. Co.* v. *Eskew*, 86 *Ga.* 641 (5, 6) (12 S. E. 1061, 22 Am. St. R. 490), in which (page 647) the

following is held: "A person upon whom a wrong has been committed is under obligation to lighten the damages as much as he can by the use of ordinary care and diligence. To the extent in which his damages are increased by his failure to observe such care and diligence, they are the result of his own negligence."

This ground, however, is incomplete within itself, in that it fails to set out any evidence. The evidence in some cases would authorize this charge; in others it might not. Since the ground here fails to show whether the charge was authorized, it is incomplete and cannot be considered by this court.

■ Ground 4 of the amended motion complains that the court, when charging on the plaintiff's contentions, erred in not charging more fully and in detail the plaintiff's contentions as to his injuries. The court charged on his contentions as follows: "At the time of the said impact, it is alleged, plaintiff was sitting in his seat in the bus and as the result of the collision of the bus with the telephone pole the plaintiff was thrown forward violently into the back of the seat in front of him, causing injuries to the plaintiff as set out in the petition, and in paragraph 15, the next paragraph, the plaintiff undertakes by allegation to detail the alleged injuries claimed to have been suffered by him. It is then alleged that as the result of the accident the plaintiff has suffered and will continue to suffer intense and excruciating pain." The court further charged: "The pleadings in the case will be out with you and you will have recourse to them as often as necessary or desirable to inform yourselves of the pleadings and exact contents thereof." The charge as a whole fully submitted the plaintiff's contentions to the jury, and if the plaintiff desired a more detailed charge as to his injuries, he should have made an appropriate request therefor. *Batts* v. *Bedingfield,* 204 *Ga.* 160, 164 (48 S. E. 2d 848) ; *Fortson* v. *Caudell,* 74 *Ga. App.* 276, 280 (39 S. E. 2d 579).

■ Although the general grounds of the motion for new trial are not here decided, since the case is to be tried again, nevertheless the sufficiency of the evidence will be discussed in order to point out the fact that this is at least a close and doubtful case. On the question of the negligence of the driver of the defendant's bus, it appears without dispute that the driver of the bus ran all four wheels off the highway and hit a pole or post

which was situated alongside the road; that this pole or post was anywhere from 6 feet to 30 feet tall and anywhere from 6 inches to 8 inches in diameter; that, when the bus struck this object, it broke off at ground level and the bus traveled some 25 feet before stopping; that, at the moment of impact, the bus was traveling not less than 15 miles per hour, but immediately prior thereto had been traveling 25 miles per hour; that the bus company has a rule to the effect that whenever an occurrence out of the ordinary which may result in damage to one of its vehicles takes place, another bus is sent to the scene and all passengers and baggage transferred from the bus which may have been disabled to the other bus; that on the occasion in question this procedure was followed, but the bus which hit the post was on examination found not to have been disabled in any way; that at the time of the impact the plaintiff was dozing or sleeping on a seat of the bus and was thrown onto the floor; that the fall snapped his neck and his coccyx and head were bumped; that shortly thereafter all passengers were given cards to fill out and on his card the plaintiff stated that he was hurt; that this card was not introduced in evidence by the defendant, although it was delivered into the possession of the defendant at the time it was signed; that he suffered pain at that time and has continued to suffer pain; that the plaintiff had previously undergone a prostate operation on August 30 and another on October 25, 1949, preceding the collision of March 3, 1950, but had recovered therefrom; that immediately after the bus hit the post he again began to pass blood, and this first occurred a few hours after the impact; that, on account of the bleeding, he stopped off in Palmetto on his way to Fort Myers and stayed until the next day, then went on to Fort Myers; that he had also suffered other injuries prior to 1949 but had recovered from them and was able to go about his business of raising gladiolas; and that since March, 1950, he suffered continuous pain and was unable to bend over and unable to do any physical work. The testimony of the defendant's witnesses who were on the bus was to the effect that they heard the plaintiff make no complaint and knew nothing about him falling to the floor at the time of the impact. The plaintiff and two physicians for him testified as to his impaired physical condition. A doctor for the defendant, who examined

the plaintiff prior to the trial, found disabilities which, however, he attributed to previous injuries.

A part of the evidence set out herein was the testimony of the plaintiff himself, and although certain circumstances were introduced by the defendant tending to show a different state of facts, the evidence on behalf of the plaintiff, together with the circumstances showing negligence on the part of the defendant, as herein set out, authorized a verdict in his favor. Thus, at least a close and doubtful case was presented.

The trial court erred in denying the motion for a new trial for the reasons set out in the first division of this opinion.

*Judgment reversed. Gardner, P. J., Townsend, Carlisle, and Nichols, JJ., concur. Felton, C. J., dissents.*

FELTON, C. J., dissenting. I dissent from the first-division ruling in the majority opinion and from the judgment of reversal.

Ground 6 of the amended motion complains that the court erred in admitting over objection certain testimony. G. H. Young, district passenger agent of the defendant in Gainesville, Florida, had been called to the stand for the purpose of cross-examination by the plaintiff's counsel. On redirect examination, the witness was asked the question: "Was there any charge outstanding against your driver when you got to the police station and reported this accident?" to which the witness answered, "No, there wasn't." It was this testimony that was objected to. Through depositions of certain police officers the plaintiff introduced such evidence as: "This accident was in the City of Gainesville. . . An accident is supposed to be reported to the Gainesville police within a reasonable length of time after the accident occurs, usually before the vehicle is removed. . . I don't know how long after the accident occurred before it was reported to my office." The following testimony was elicited from Mr. Young while he was on the stand under cross-examination: "This first came to my attention when I came down to work at 9 o'clock in the morning. The dispatcher told me that one of our buses had knocked down a post of some kind. . . Our dispatcher does not leave before I get there. He doesn't make a report to me of those accidents, he just tells me. My knowledge of this accident was acquired from the dispatcher. . . The driver normally reports his own accidents to the po-

lice. I don't know whether or not this driver reported his accident to the police. Gainesville has about 30,000 citizens. The police department here stays open at all hours of the night." The plaintiff's counsel brought out in his own evidence that the collision should have been immediately reported to the police and that there was a police investigation of the matter. On the cross-examination of Mr. Young, he brought out that the driver did not report the incident to the police, but that Mr. Young made such report after 9 o'clock in the morning. It was also brought out on such cross-examination that the police station was open all night. As to why the plaintiff's counsel went into the matter of the report of the collision to the police, when it should have been made, when it was actually made and by whom it was made, is a matter of mere conjecture. It had no bearing on the question of negligence and damages. The defendant's counsel contends that "plaintiff's counsel carefully sought to create the impression that the bus driver was guilty of 'hit and run,' " and the impression that "the local law enforcement agencies of this town were enraged by the action of the driver." Whatever may have been the motive, we think that when the plaintiff's counsel went into the matter when Mr. Young was on cross-examination, the defendant's counsel was properly allowed to ask the question objected to and elicit an answer thereto on the redirect examination of Mr. Young. "The conduct and extent of redirect examination of witnesses, which follows and is intended to neutralize the effect of cross-examination, is left to the sound discretion of the trial judge, and will not be controlled unless abused." *Aycock* v. *State*, 62 *Ga. App.* 812, 813 (2) (10 S. E. 2d 84) ; *Caldwell* v. *State*, 82 *Ga. App.* 480 (61 S. E. 2d 543). Further, there was not a sharp conflict in the evidence as to whether or not the bus driver was negligent. We do not think that question gave the jury any grave concern. The driver practically admitted on the stand that he was careless. He testified: "I am familiar with this road from Lake City down to Tampa. I had made that run quite a number of times before and I knew that road along there. I knew there was a jog in the road as you come into Gainesville that you have to cut back sharp to the left and then to the right. I knew I was approaching that. I was keeping a look-out in front of the bus as I

approached that pole up until I started to open that ventilator and it attracted my attention longer than it should have and at that particular time I was not looking like I should have at that particular time." This testimony virtually demanded a finding that the driver was negligent. Therefore, the testimony objected to could not even remotely have influenced the jury in their deliberations on the question either of negligence or of proximate cause. Further still, the mere fact that no charges were pending when the agent reported the collision to the police does not exclude the possibility that charges were later made.

The plaintiff testified that at the time of the collision he was thrown from his seat onto the floor of the bus and that his neck was "snapped, his head was bumped, and his coccyx was bumped." This, he contends, caused the injuries sued for.

In addition to the bus driver's testimony that after the collision he repeatedly asked the passengers if anyone was hurt and no one replied that he was, and that everyone appeared to be unhurt, the following testimony was introduced in evidence by the defendant:

Louis T. David testified in part: "I was in seat twenty-six on the bus on the right-hand side right over the hind wheel. I was right over the rear wheel. There was nothing special happened in Gainesville as I know of, only just the accident there. We were going along and I was sleeping and I heard a crash and I woke up and the bus was stopped then and I thought it hit something. It hit a small pole that was standing there. . . I put my coat on and my grandchild's and we got off the bus and looked around a few minutes and it was kind of chilly there for him and I got back on the bus. It was chilly early in March. I did not see anything wrong with the bus. I looked around to see; but I couldn't see anything wrong. I looked at the front end of it. It was not bent. The bumper was not bent. . . I did not see any signs of the bus skidding around there anywhere. Neither my grandson nor I were thrown out of our seats nor did we fall out in any way. There was a little jar of the bus at this occurrence but there wasn't enough to knock me out of my seat or anything, and not my grandson. He was lying there sleeping. It didn't move him, didn't hurt him any. He was still sleeping. When the bus crashed he woke up. I don't know that anybody

did anything when this bus stopped. The driver came around and asked if anybody was hurt and he opened up the door and got out and I guess practically all of us got out of the bus and looked around, and I didn't see anybody hurt. I did not see any signs of any injury. Nobody to my knowledge complained and said that he was hurt. Nobody said that he wanted medicine or a doctor. If they said it I might have heard it. I was right there with them, I was right there in the middle of them. . . Then when he [the driver] got back and the other bus was pulled up there we transferred to the other bus. Both of these gentlemen were down there at the steps at the side of the bus when the transfer was being made and helped us off the bus and helped us on the other bus. I did not hear anybody do any complaining while that was going on. . . When the accident happened and he turned on the lights and looked around I did not see anybody on the floor or against anything or any signs that anybody had been thrown out of his seat. You ask me if I was in the back end where I could look forward and see virtually everybody in the bus. I think they were all in their seats practically. I didn't see anybody out in the aisle or anything. I did not see anybody picking himself up off of the floor, down on the floor and getting up, climbing back on the seat."

Mrs. Edith Lewis testified in part as follows: "I was sleeping at the time we came into Gainesville immediately before the occurrence. I woke up when he put on the brakes or when he went to stop because I had my purse on my lap and it slid off. I was not thrown out of my seat. I didn't see anybody else thrown out of their seat. I was seated in the second seat behind the driver, next to the window. I was on the driver's side, two seats back. . . The lady who was seated next to me did not fall out or get hurt in any way. When the bus stopped there at the occurrence the driver put on his lights and slid off from his seat and asked if everybody was all right. Nobody made any show of injury. No one made any complaint of injury to my knowledge. I didn't see anybody shuffled or thrown around any way. The driver then got out of the bus and asked everybody to remain in the bus. I imagine that he went to call someone. He came back in possibly fifteen minutes. I think he came alone. Another bus followed him. When he got back some of

the people were out on the ground and he asked them to get back into the bus. When they got back in the bus the inside light was on. Then he asked us again if everybody was all right. Nobody complained or said anything that I heard. When the next man came up with another bus he came into the bus, too, and he asked if we were all right. Nobody complained then that I heard. . . The two drivers checked us off one bus and onto the other. Our original driver then took the second bus and took us on downtown. They brought the original bus in right behind the bus we went down to Gainesville on. I didn't see any signs of any damage to the bus. I got a look at it. I didn't get off the bus at the time of the occurrence until I transferred. When I got off one bus and onto the other I just glanced at the bus I got off of. I looked at the front end of it. I didn't see any scars where it hit the post. When we got down to the station I would imagine we stayed around there fifteen or twenty minutes, had coffee and sandwiches. This same driver got us off the bus. After I had fifteen minutes there, there was no signs that I saw that anybody was injured anywhere around. I got back on the bus as soon as the relief period was over."

Miss Myrtice Fleagle testified in part as follows: "There was an unusual occurrence that night as we were going into Gainesville. There was a parkway in the street and the parkway stopped and the street went into one without a parkway in it and he hit the little post as he started to make the turn. That is what I would call a jog or a set-off in the street. I was awake as we approached that. There was no bad shakeup or throwing people out of their seats or anything of that sort. I was not thrown forward out of my seat. I was in a position where I could pretty well see the other people in the bus. . . The first sensation that I had that we were coming to a stop was when the driver applied the brakes. The brakes seemed to work very well. I didn't have any sensation of skidding. I would have known it if the wheels had skidded. When I had the sensation that the driver was applying his brakes he was turning to the right. He went about twenty or twenty-five feet then before we came to a stop. It didn't seem to make any noise when the bus hit the post. I didn't notice any feeling when the bus or bumper came in contact with the post. When the bus stopped the driver

automatically turned on the lights and inquired if anyone was hurt. I mean the inside lights, and asked if everyone was all right. No one registered any complaint. Then some of us started to get off of the bus, I for one, and he told us to get back on the bus, he would be back in a minute. I presume he went to call someone concerning the company and he was gone about fifteen minutes. When he came back some of the people on the bus had gotten off while he was gone and he got them all back on the bus and he asked again if everybody was all right. Nobody made any complaint then. Then in about fifteen minutes some man came up with another bus. . . When the second man came up with the other bus he got on the bus that we were on and asked again if we were all right. There was no complaint then. Then he stood by the door and we all got off the bus we were on and went around the front of the bus and got onto the bus that he had brought out and the driver of the bus we were on was standing by the door of the bus we got on, the baggage was transferred and we went on into the station. . . When we got down to the station all of us got off and went in. We stayed there about fifteen or twenty minutes. There was no evidence of anybody injured while I was there. I was mixing and mingling with all of them around there. We were having coffee and sandwiches. If anybody had been noticeably injured and complaining, I think I would have been in position to see it."

The evidence also showed that after the collision the plaintiff traveled by bus to Tampa, Florida, thence to Palmetto, thence to Fort Myers, thence to Fort Lauderdale (where he spent five days), thence to Cocoa, and thence back to Atlanta. At none of the above places did the plaintiff see a doctor or seek medical assistance in reference to his alleged injuries, even though he testified: "I suffered pain all the way on the journey from there [Gainesville] on. It seemed to increase as I went along rather than decrease. When we had the accident I didn't pay too much attention to it. I mean I got up and I went on the other bus and I walked around by myself and with others and I didn't realize I was hurt too bad at the time but I began to realize it more when we got to Tampa."

Dr. Exum Walker, who testified for the plaintiff, based his testimony as to the plaintiff's injuries on a sudden jerking of the head and a sudden snapping of the plaintiff's neck.

From the above evidence the jury was authorized to find that the plaintiff was not thrown from his seat and that the bus did not stop in such a manner as would cause the plaintiff's head to be jerked forward and a snapping of his neck, and to find that the plaintiff was not injured in the collision as contended.

Assuming that the plaintiff was suffering some pain and symptoms of injury, the evidence authorized the jury to find that such pain and symptoms resulted from injuries which pre-existed the bus collision. Some years before the bus collision, the plaintiff had been shot in the neck with a pistol bullet. Concerning this Dr. Allen M. Collinsworth testified: "If he received a shot as described by him and in this picture and lead remains in there and the conditions are such as I found them and if he now has occipital region pain, it is quite possible that this could be the cause of pain. As proved by the X-ray film of the path of the bullet, fragments of lead, or whatever material it was, still remain within the muscles of the neck. When a bullet is fragmented it causes bleeding and damage in the tissues that it passes through, whether it remains solid or divides into fragments. That will cause adhesions and adhesions can cause pressure or pinching upon a nerve with the production of pain. Internal scar tissue results from such shots as this one always. Scar tissue is the tissue stuff such as you see on the outside of a scar and it can be inside just like it can be on the skin. As a rule if that impinges on a nerve it causes pain."

The plaintiff testified that in 1941 he was in a "violent accident" when his automobile collided with another automobile. In that collision he suffered a double brain concussion and "my head was driven down on my chest pretty strong and injured my neck. I was knocked out." In an action growing out of that collision, the plaintiff admitted he gave the following deposition: "You see, my neck has been stiff and sore ever since the [1941] accident, and, in fact, it sets up so stiff at night if I do drop off to sleep, if I move my head a little it wakes me up with a pain and, as a matter of fact, I have not had one good night's sleep since this accident, due partially to the injury to the spine and to the upper part of the spine in the neck and the brain concussion and the headaches are really more severe than the pain in the neck; my head aches continually twenty-four hours a

day; I don't mean a light ache, I mean it really aches; I don't expect you have ever had one similar to it and I hope you never do; but at times it just feels like the whole top of my head is going to blow off, especially the back part, that is continuous, night and day; and that is what worries me more than anything else now; it has been about eight months since it happened and it seems to me if it was going to clear up by now, seven months, it seems like it is about stationary. . ."

Dr. Exum Walker testified for the plaintiff, in part: "My only information concerning his earlier pain from the 1941 injury was from what he said. I gathered from what he said that apparently that was about the same pain that he has now. From his description of this, he was going through the same thing that he was describing to me back there. . . My records have here the statement that the pain lasted several years from his 1941 injury. He said they had died out. I don't recall whether he stated to me the years specifically. His pain could subside spontaneously but if it persists for a year without improving we must assume it is most likely to continue at least over a long drawn out period."

The testimony objected to, if error, was harmless, and the evidence authorized the verdict; therefore the judgment should be affirmed.